UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ABEBA MEKONNEN,                    )
                                   )
          Plaintiff,               )
                                   )       CIVIL ACTION NO.
     v.                            )       12-12183-DPW
                                   )
OTG MANAGEMENT, LLC                )
                                   )
          Defendant.               )


MEMORANDUM AND ORDER
July 25, 2019


     Plaintiff Abeba Mekonnen has proceeded *pro* se[1] in this

workplace discrimination action against her former employer

---

[1] Ms. Mekonnen has formally proceeded *pro se* but also has, at all
stages in this litigation, been advised, mostly from behind the
scenes, by her former husband, Begashaw Ayele.  Though Mr. Ayele
is not an attorney, he unsuccessfully sought to "appear" on
behalf of Ms. Mekonnen, [*see* Dkt. No. 33], and identified
himself as her "assistant," because he has an "economic interest
and knew the plaintiff's case as much as she does knew [*sic*]
from the beginning to the present."  [Dkt. No. 85].
     Throughout this litigation, Mr. Ayele has involved himself in
the proceeding as an officious intermeddler and his
participation has interfered with the effective and orderly
resolution of the dispute to such an extent that, during a
hearing on September 23, 2014, I barred Mr. Ayele from
purporting to act further on behalf of Ms. Mekonnen.  *See* Dkt.
No. 90; *see also* Transcript of hearing at Dkt. No. 92.
     Mr. Ayele, and his tactics, are not unknown to various members
of this court and at least one of my colleagues indicated well
before this litigation was filed that Mr. Ayele should be
treated as a potentially vexatious litigant.  *Ayele* v. *U.S.
Security Associates, Inc.*, Case No. 1:05-CV-11273-WGY (D. Mass.
Oct. 5, 2005) (order entered electronically, *see generally*
transcript of hearing at Dkt. No. 22).  I have similarly found
in this proceeding a lack of candor and an indifference to
procedural rules by both Ms. Mekonnen and Mr. Ayele.  I provide

Defendant OTG Management, LLC, alleging several different
theories of discrimination under Title VII of the Civil Rights
Act of 1964, the Americans with Disabilities Act ("ADA"), and
state law.

## I. BACKGROUND

### A.   *Facts*

OTG operates a CIBO Express Gourmet Market at Logan Airport
in Boston, MA, where it employs both utility workers, who
transport materials from the storage room to the storefront, and
cashiers.

Ms. Mekonnen applied for a cashier position at the CIBO
Express Gourmet Market on July 2, 2007.  In her application, she
indicated that she preferred to work from 1 PM to 10 PM and that
she needed Sunday mornings off to attend church.  Ms. Mekonnen
is an Orthodox Christian.  The only shift OTG had available at
the time was an early morning shift from 5 AM to 1 PM.  Ms.
Mekonnen accepted the early morning shift, with the hope that

---

in an Appendix a summary of their respective litigation
histories.
   That said, I have, as will be evident in this Memorandum, read
Ms. Mekonnen's submissions liberally.  *See Erickson* v. *Pardus*,
551 U.S. 89, 94 (2007) (per curiam) ("A document filed *pro se* is
to be liberally construed . . . and a *pro se* complaint, however
inartfully pleaded, must be held to less stringent standards
than formal pleadings drafted by lawyers." (internal citations
and quotations omitted)).  To that end, I have painstakingly
sought to provide a reasoned explanation of my resolution of
every alternative theory colorably presented by Ms. Mekonnen in
this litigation.

she would be able to have Sunday mornings off, and began working for OTG on August 4, 2007.

The parties dispute whether OTG required Ms. Mekonnen to work on Sunday mornings in 2007.  According to William Khayat, a former Terminal Director for OTG, Ms. Mekonnen's regular work schedule was Monday to Friday and every effort was made to avoid scheduling her shifts on Sunday.  Ms. Mekonnen claims she had to work during church services approximately two or three times in her first month at OTG.  OTG no longer has copies of Ms. Mekonnen's work schedule from 2007 and 2008, but payment records indicate Ms. Mekonnen worked several Sundays in 2007, including every Sunday in December 2007.

The parties also dispute whether Ms. Mekonnen informed OTG that she had a disability in 2007.  Ms. Mekonnen claims that in early August 2007, she told her direct supervisor Lily Molla that she had a leg problem and requested to sit in an elevated chair during her shift.  In addition, she claims she gave OTG a medical certificate from Ethiopia that stated she suffers from osteoarthritis in her right knee.  Mr. Khayat denied ever seeing the Ethopian medical certificate and claimed Ms. Mekonnen never informed him she was disabled.

A few weeks after Ms. Mekonnen started work, Begashaw Ayele, Ms. Mekonnen's then husband, who also worked at Logan Airport, had a conversation with Mr. Khayat about issues Ms.

3

Mekonnen was having at OTG.  Mr. Ayele told Mr. Khayat that Ms. Mekonnen was concerned about having to work on Sunday mornings. According to Mr. Ayele, he also informed Mr. Khayat that Ms. Mekonnen had a permanent leg injury.  Mr. Khayat recalled that a discussion with Mr. Ayele took place, but did not recall any discussion of Ms. Mekonnen's medical issues.  Mr. Ayele wrote a letter to Mr. Khayat a few days later, in which he informed Mr. Khayat that recently at OTG "a Christian employee who was offered full time job from Monday to Friday was required to work on his/her religious observance day all in favor of a Muslim employee."[2]  Mr. Ayele cited MASS. GEN. LAWS ch. 149 § 103 and wrote that "[a]ccording [to] this statute, employers must allow employees to do their work in a seated position . . . all industries are covered and OTG is no exception."  Mr. Ayele also claims he later called the human resources department at OTG to discuss these issues.

Ms. Mekonnen claims Mr. Khayat and Ms. Molla treated her less favorably after Mr. Ayele sent the letter.  According to Ms. Mekonnen, they prevented her from taking a lunch break until approximately an hour before her shift ended and from taking bathroom breaks during her shift.  She also claims Mr. Khayat

---

[2] Mr. Ayele did not mention Ms. Mekonnen's name specifically, but said that he had learned of these issues from an employee whom he had "deep interest through blood relationship, marriage, national origin affiliation and the like."

and Ms. Molla assigned her tasks that were not a part of her regular duties and failed to provide her with the proper change for her register at the start of her shift.  Mr. Khayat denies that he treated Ms. Mekonnen differently than any other employee when it came to providing her with meal breaks, restroom breaks, or proper change for her register.

In January 2008, Ms. Mekonnen was injured at work when a door fell on her leg.  She sprained her knee and had a contusion, but did not break any bones.  She received two doctor's notes: one on January 22, 2008 which advised her to remain out of work for three days, and one on February 11, 2008 which advised her to remain out of work for five days.  Ms. Mekonnen returned to work after two weeks and continued working full-time.

During Ms. Mekonnen's time with OTG, the company received mixed feedback about her from customers; the trend in this feedback suggested diminishing performance over time.  In this connection, OTG participated in a "secret shopper" program, in which customers would visit stores and report on their experiences.  In the first report about Ms. Mekonnen, dated August 27, 2007, she received an overall score of 78% and was described as having "a lovely smile and demeanor" that "made [the customer] feel very welcome."  In a second report, dated November 16, 2007, she received an overall score of 58%.  This

"customer" found that Ms. Mekonnen did not understand English well and did not demonstrate knowledge of the items for sale. In the third report, dated May 8, 2009, Ms. Mekonnen received an overall score of 32%. The customer found that "[i]nteracting with the unfriendly Associate was memorable" and reported that Ms. Mekonnen was talking on her cell phone when the customer entered the store. OTG had previously received a complaint that Ms. Mekonnen took a personal phone call while checking out a customer on February 9, 2009. Ms. Mekonnen claims she was not on her cell phone during either of these exchanges.

Ms. Mekonnen was also disciplined repeatedly by her supervisors at OTG. She received and signed a written warning on June 10, 2008 for sitting on top of a plastic box while working. Ms. Mekonnen admits she would sit at times while she worked, but claims she had to do so because of her knee issues. On May 19, 2009, Ms. Mekonnen received a written warning for failing to check the expiration date on a product. The warning noted that the consequence of further infractions would be termination. Ms. Mekonnen's signature does not appear on this written warning. Ms. Mekonnen claims utility workers at OTG, not cashiers, were responsible for inspecting the expiration dates of products.

Subsequently, Ms. Mekonnen received another low score on a secret shopper report and she was terminated on November 19,

2009.  Her termination form listed the reason for firing as
"poor job performance, 3 below avg. failing secret shopper
scores."

## B.    Procedural History

Ms. Mekonnen filed an administrative charge of
discrimination and retaliation with the Equal Employment
Opportunity Commission ("EEOC") and the Massachusetts Commission
Against Discrimination ("MCAD") on May 10, 2010.  She also filed
a complaint with the Massachusetts Office of the Attorney
General regarding OTG's alleged failure to pay out her accrued
vacation time promptly.  On May 25, 2010, the Attorney General
granted Ms. Mekonnen the right to bring an action.

The MCAD dismissed Ms. Mekonnen's complaint on April 30,
2012.  Thereafter, the EEOC sent her a right to sue letter on
August 28, 2012.

Ms. Mekonnen initially filed her complaint in state court
and OTG removed the case to this court on November 23, 2012.
Ms. Mekonnen filed an amended complaint on April 23, 2014.  She
alleged that OTG discriminated against her on the basis of her
disability, religion, sex, and age in violation of state and
federal law.  She also alleged that OTG retaliated against her
for raising such claims with management.  With respect to wages
and hours, Ms. Mekonnen alleged that OTG had failed to pay out
her vacation benefits, and that it violated Mass. Gen. Laws ch. 136

7

§ 6(50) and § 16 by forcing her to work on Sunday.  Finally, Ms.
Mekonnen brought assorted claims against Mr. Khayat in his
individual capacity.  I have dismissed Ms. Mekonnen's age
discrimination claim, her claim under MASS. GEN. LAWS ch. 136
§ 6(50) and § 16, and her claims against Mr. Khayat.  OTG has
moved for summary judgment as to the remaining claims.

## II.  MOTION TO STRIKE

Along with her opposition to summary judgment, Ms. Mekonnen
submitted several exhibits and affidavits.  OTG moved to strike
certain of the exhibits and sections of the affidavits,
contending that they include documents Ms. Mekonnen did not
identify or produce during discovery and statements that
constitute hearsay or that were not based on personal knowledge
and therefore are inadmissible.

Under FED. R. CIV. P. 37(c)(1), "[i]f a party fails to
provide information or identify a witness as required by
Rule 26(a) or (e), the party is not allowed to use that
information or witness to supply evidence on a motion."  FED. R.
CIV. P. 37(c)(1).  If a party fails to comply with the discovery
requirements imposed by the Federal Rules and his failure to
comply is neither substantially justified nor harmless, then the
belatedly offered evidence may be stricken.  *Greene* v. *Ablon*,
2012 WL 4104792, at *2 (D. Mass. Sept. 17, 2012), *aff'd in part*,
794 F.3d 133 (1st Cir. 2015) ("In its analysis [with respect to

8

a motion to strike], the Court considers a number of factors

. . . Surprise and prejudice are important integers in this

calculation." (internal citations omitted)).

I will strike certain exhibits not produced during

discovery, specifically Ms. Mekonnen's medical certificate from

Ethiopia and the three sets of cell phone records.  Ms. Mekonnen

herself admits she did not provide these exhibits to OTG during

discovery, despite being required to do so.  Her failure to

inform OTG earlier of these exhibits is not harmless.[3]  The

medical certificate introduced a previously underdeveloped

theory of disability or handicap into the case, while the cell

phone records attempt to offer a new way of proving that OTG's

reason for terminating Ms. Mekonnen was pretextual.  For the

sake of completeness, however, and because consideration of

these documents does not change my ultimate view of the merits,

I will discuss them in conjunction with my consideration of the

merits of her underlying claim.

---

[3] Ms. Mekonnen explains that she did not provide OTG with the
Ethiopian medical certificate because the hospital that issued
it is outside the United States.  At the same time, she also
notes that the certificate is eighteen years old and that she
showed it to Ms. Molla while she worked at OTG.  If Ms. Mekonnen
had it within her possession and control when OTG requested her
medical records as part of the discovery process – which it
appears she did – she had a duty to provide it to OTG in a
timely fashion.

I will not strike the November 1, 2016 letter from her doctor at Massachusetts General Hospital, though this letter was not produced as part of the original round of discovery.  The letter itself did not exist until November 1, 2016 and Ms. Mekonnen provided it to opposing counsel on December 12, 2016. Although Ms. Mekonnen could have submitted the letter more promptly, I do not find OTG was prejudiced by this brief delay.

Finally, I will not strike references to these submissions in Ms. Mekonnen's affidavit, her other filings, and Mr. Ayele's affidavit.  Ms. Mekonnen may explain the history of her leg problems and Mr. Ayele may offer his observations of Ms. Mekonnen's condition.  I will simply treat other references to the Ethiopian medical certificate in the statement of facts as argument.

Turning to the affidavits submitted by Ms. Mekonnon, I will strike some, but not all, of the sections identified by OTG. Under FED. R. CIV. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge" and must "set out facts that would be admissible in evidence."  When striking statements in an affidavit, a court must use "a scalpel, not a butcher knife" in order "to disregard those parts of it that are inadmissible and to credit the remaining portions."  *Perez* v. *Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001).

I will strike the portions of her submissions that constitute garden-variety hearsay.  From Ms. Mekonnen's affidavit, I will strike the part of paragraph 5, where she states: "One day, Begashaw [Ayele] . . . asked Mr. Khayat, Ms. Molla's boss, why my request for leg injury and religious accommodation was ignored.  Begashaw told me that Khayat had no answer."  From Mr. Ayele's affidavit, I will strike the part of the second sentence of paragraph 5, where he states: "Abeba [Mekonnen] told me that Lily's promise have Sunday off as an to accommodation for church [*sic*] was not realized"; the part of the second sentence of paragraph 14, where he states: "Abeba said 'I do know that they took the money to the office but unable to know whether they pocket the money for themselves"; the part of paragraph 15, where he states: "Abeba told me that she can not continue to work unless she sit at a given time interval to alleviate her leg problem"; and, the first two sentences of paragraph 16.  From Samuel Negash's affidavit, I will strike the part of paragraph 11, where he states "I heard that she [meaning Ms. Mekonnen] was conversing with employees that Mr. Khayat had fired her for talking by phone while she was on duty."

I also note that I will not consider the sections of Mr. Ayele's affidavit which recount his interviews with other OTG employees as substantive evidence of how other OTG employees

were treated.  This recounting is focused on the second sentence
of paragraph 17 and on paragraphs 18, 19, and 20.

I will not strike the sections of Ms. Mekonnen's
submissions that are based upon her review of other documents.
Most of OTG's objections arise from instances where Ms. Mekonnen
provides her own understanding and interpretation of OTG's
business records or other evidence properly before me.  For
example, Ms. Mekonnen submitted a document titled "Refuting
Murphy's Declaration and his Exhibit No. 9," in which she
compares OTG's records of her work schedule to her own
calculation of her work schedule based on her pay records.
"Motions to strike have been denied when the declarant did not
personally experience the matters discussed in the affidavit,
but did review business or public records and included
information from those records with the affidavit." *Facey* v.
*Dickhaut*, 91 F. Supp. 3d 12, 20-21 (D. Mass. 2014).  To the
extent these submissions could raise evidentiary concerns, I
will simply treat her gloss on other documents as argument and
will rely only on the underlying documents themselves as
evidence.

Finally, I recognize Ms. Mekonnen's Statement of Material
Facts contains many statements not supported by citations to the
record, as required by Local Rule 56.1.  I will deem admitted
those facts Ms. Mekonnen has failed to dispute with citations to

the record and strike statements included in her submission that
are not supported with citations to the record, though I will
still fully consider "whether the moving party has met its
burden" based on "those facts adequately supported by the
record." *Paul* v. *Johnson*, 2013 WL 5299399, at *1-2 (D. Mass.
Sept. 17, 2013).  For the purpose of evaluating OTG's motion for
summary judgment, I will treat these statements as in the nature
of argument.

### III. MOTION FOR SUMMARY JUDGMENT

### A.   *Disability Discrimination*

Ms. Mekonnen alleges that OTG failed to provide her with a
reasonable accommodation for her disability and that OTG
discriminated against her on the basis of her disability by
issuing her a warning for sitting on a plastic box, by altering
her job duties, and ultimately by terminating her.

I analyze her disparate treatment claims under the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et
seq.*, and the Massachusetts Antidiscrimination Act, MASS. GEN. LAWS
ch. 151B ("151B"), using the *McDonnell-Douglas* burden-shifting
framework.  *Tobin* v. *Liberty Mut. Ins. Co. ("Tobin I")*, 433 F.3d
100, 104 (1st Cir. 2005) (citing *McDonnell Douglas Corp.* v.
*Green*, 411 U.S. 792 (1973)).  Ms. Mekonnen must first show that:

> (1) [s]he suffers from a disability or handicap, as defined
> by the ADA and Chapter 151B, that (2) [s]he was
> nevertheless able to perform the essential functions of

13

[her] job, either with or without reasonable accommodation, and that (3) [defendant] took an adverse employment action against [her] because of, in whole or in part, [her] protected disability.

*Id.*

Under both the ADA and 151B, a person "is considered disabled if she (a) has a physical or mental impairment that substantially limits one or more of her major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment." *Ruiz Rivera* v. *Pfizer Pharm., LLC*, 521 F.3d 76, 82 (1st Cir. 2008); *see also Dahill* v. *Police Dep't of Boston*, 748 N.E.2d 956, 962-63 (Mass. 2001) (identifying "three avenues by which a person can establish that [s]he falls within the statute's protection" under state law).

If Ms. Mekonnen establishes a *prima facie* case of discrimination, the burden shifts to OTG to articulate a legitimate, nondiscriminatory reason for its employment decision and show this was the true reason for its action. *Tobin I*, 433 F.3d at 105 (citing, *inter alia*, *McDonnell Douglas*, 411 U.S. at 802). At this point, if OTG "offers such a reason, the burden shifts back to [Mekonnen], and [s]he must proffer evidence to establish that [defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." *Id* (citing *McDonnell Douglas*, 411 U.S. at 804).[4]  "The ultimate burden of

---

[4] Under MASS. GEN. LAWS ch. 151B, the burden of showing pretext is

proving unlawful discrimination rests at all times with [Ms. Mekonnen]." *Id.*

To survive summary judgment for her reasonable accommodation claims under the ADA, Ms. Mekonnen must show "(1) [s]he is disabled within the meaning of the ADA, (2) [s]he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [defendant], despite knowing of [her] disability, did not reasonably accommodate it." *Rocafort* v. *IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003). Similarly, for her reasonable accommodation claims under 151B, Ms. Mekonnen must show "[she] was a 'qualified handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation; [she] requested such accommodation, and [defendant] refused to provide it; and, as a result of this refusal, [s]he suffered some harm." *Alba* v. *Raytheon Co.*, 809 N.E.2d 516, 522 n.9 (Mass. 2004).

1.   Exhaustion

Before examining the merits of her claims, I must determine whether Ms. Mekonnen has adequately pled and previously

---

different than the federal standard because "the plaintiff employee may defeat an employer's motion for summary judgment by showing that there are disputed issues of fact as to whether the employer's proffered reason was not the true reason, which permit the inference that the employer offered a pretextual reason because the true reason was discrimination on the basis of handicap." *Gannon* v. *City of Boston*, 73 N.E.3d 748, 757 (Mass. 2017).

exhausted all of the theories of disability discrimination she now advances.  Relying in part on the Ethiopian medical certificate I have stricken, Ms. Mekonnen claims in her opposition to summary judgment to suffer from osteoarthritis. Ms. Mekonnen had previously relied on her at-work leg injury in January 2008 as the sole basis for her disability claim, both in her administrative charge before MCAD and in her complaint in this case.

I find Ms. Mekonnen has sufficiently pled disability discrimination based on her osteoarthritis in her complaint in this court.  According to her amended complaint, as early as August 2007, she had a "leg problem" that was aggravated by OTG's failure to provide her with an elevated chair and that it was "[b]ecause of this and the employer's failure to accommodate the Sunday off time for worship" that Mr. Ayele wrote the September 2007 letter to Mr. Khayat.  The complaint also mentions how she had one written warning for sitting while at work because of a preexisting leg problem and later injury sustained while at work.  Even if Ms. Mekonnen previously placed greater emphasis on her at-work injury, her complaint gave OTG adequate notice of a theory of disability discrimination based on a preexisting leg problem, even if it did not elaborate on the source of that problem.

16

Whether Ms. Mekonnen exhausted administrative remedies for her disability claim based on her pre-existing knee condition is a closer call.  Under both the ADA and 151B, an employee must file an administrative charge either with the EEOC or with the parallel state agency before filing suit.  *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996); *see also Thornton* v. *United Parcel Service, Inc.*, 587 F.3d 27, 31 (1st Cir. 2009). Because it would frustrate the purpose of the administrative proceedings "if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action," the scope of any successive lawsuit is limited to the scope of the administrative charge "and the investigation which can reasonably be expected to grow out of that charge."  *Id.*  When an employee acts *pro se*, as Ms. Mekonnen does here, courts construe the administrative charge liberally and "afford the complainant the benefit of any reasonable doubt," but "[e]ven a *pro se* complainant is required to describe the essential nature of the claim and to identify the core facts on which it rests."  *Id.*

Ms. Mekonnen's administrative charge does not mention her osteoarthritis diagnosis.  Instead, her administrative charge framed her disability claim entirely around the January 2008 injury:

17

> On or about January 22, 2008 I had a work-related injury
> when a sliding door fell on my leg.  I was out of work for
> eight days due to this injury.  Upon my return I requested
> to be able to sit when there were no customers around.
> Respondent failed to accommodate my request and issued me a
> warning on June 10, 2008 for sitting when there were no
> customers in my line.  I also requested a transfer to a
> delivery position as an accommodation to my disability but
> was told delivery positions were only given to male
> employees.

In her rebuttal to OTG's position statement, she again discussed

her at-work injury but did not discuss her osteoarthritis

diagnosis.  Relying on her administrative charge, the MCAD

investigative disposition examined her disability claim only

through the lens of her at-work injury.[5]

---

[5] Ms. Mekonnen's MCAD appeal described her disability claim in
even narrower terms:

> I the complaint [*sic*] nowhere alleged that I have claimed
> disability be it on the MCAD's original complaint form or
> anywhere in my papers as the law define what disability.
> The complainant's allegation only rest with the claim of
> "**impairment**" related to my performance of my job
> responsibility because of the leg injury sustained from
> work related activity inflicted causing serious pain and
> suffering.

Throughout her appeal, Ms. Mekonnen emphasized this view,
mentioning elsewhere "[a]s repeatedly stated, my claim is
impairment but this **does not mean that employer has no
obligation to accommodate temporary injury that employee
sustained at workplace.**" (emphasis in original).  OTG contends
these statements necessarily narrow the scope of her claim in
this court.

When considering the scope of her claims, I consider the
investigation that "could reasonably be expected to grow *from
the original complaint*."  *Powers* v. *Grinnell Corp.*, 915 F.2d 34,
39 n. 4 (1st Cir. 1990).  Positions taken in the MCAD appeal
cannot narrow the scope of an investigation that has already
been completed.  *See Everett* v. *357 Corp.*, 904 N.E.2d 733, 748
(Mass. 2009) ("Once a LOPC [Lack of Probable Cause]

Ms. Mekonnen's permanent leg problem is one of those "core facts" upon which her disability discrimination claim may be said to rest; it should have been identified fully in her administrative charge. *Lattimore*, 99 F.3d at 464.  The investigator would likely have conducted a very different investigation had she known Ms. Mekonnen was contending she suffered from a permanent leg problem, in addition to the consequences of a one-time (and relatively minor) injury, as the charge represented.

Moreover, the osteoarthritis diagnosis was information that was fully within Ms. Mekonnen's control.  She knew she had osteoarthritis and, at least according to her opposition to summary judgment, she believed she was discriminated against because of this condition.[6]  Nothing prevented her, then, from providing this information to the MCAD in her initial administrative charge.

To be sure, at least the complaint makes clear reference to disability discrimination based on an injury to Ms. Mekonnen's leg and indicates, albeit obliquely, that Ms. Mekonnen had sought an accommodation to sit at work as early as September

---

determination issues [from MCAD], the administrative investigation is closed.").

[6] Her failure to mention the leg problem caused by osteoarthritis in her administrative charge appears to be yet another instance where a lack of forthrightness and candor interfered with the orderly progress of this case.

2007.   An investigator reading Mekonnen's complaint could reasonably be expected to ask why her husband referred to the Massachusetts right-to-sit law in his September 2007 letter, months before her January 2008 accident.   An investigator could also reasonably be expected to ask the complainant if she had any other problems with the same leg, which would presumably reveal the osteoarthritis condition, assuming the complainant was forthright during the process.   *See Perch* v. *City of Quincy*, 204 F. Supp. 2d 130, 134 (D. Mass. 2002) (disability discrimination claim based on employee's cancer diagnosis was within the scope of investigation for disability discrimination claim based on employee's chronic fatigue syndrome diagnosis).

Because the matter is close, and because I will grant summary judgment for OTG on Ms. Mekonnen's disability claims on other grounds, I will assume, without deciding, that her disability claim based on her permanent leg problem were properly exhausted.

2.   Timeliness

Even if Ms. Mekonnen had fully exhausted  administrative remedies, her disability claims are, at least in part, time-barred.   Under both the ADA and 151B, an employee is required to file an administrative claim "within 300 days after the alleged

unlawful employment practice occurred."[7]  *Thorton*, 587 F.3d at 31.  Ms. Mekonnen filed her administrative charge on May 10, 2010, which means her claims must be premised on acts that occurred after July 14, 2009.  However, at least some of the discrete acts on which Ms. Mekonnen seeks to rely here – her requests in August and September 2007 for an elevated chair, her request for a transfer to a utility position, and the written warning issued to Ms. Mekonnen for sitting during her shift – occurred before July 14, 2009 and individually cannot form the basis of a disability discrimination claim.

I find there is no evidence that Ms. Mekonnen made a specific request to sit while working after July 14, 2009 that OTG denied.  In determining the timeliness of a reasonable accommodation claim, "[t]he pivotal question . . . is whether [the employee] made a specific request for accommodation that was denied during the statutory periods."  *Tobin* v. *Liberty Mut. Ins. Co.* ("*Tobin II*"), 553 F.3d 121, 133 (1st Cir. 2009).  The only arguably specific requests for an accommodation Ms. Mekonnen made were in August and September 2007, when she asked

---

[7] The 300-day limitation period applies to claims filed with a state administrative agency.  *Thornton* v. *United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009).  The limitations period to file with the EEOC is shorter, and the ADA requires an employee to "file an administrative complaint with the EEOC within 180 days of the alleged unlawful employment practice." *Jorge* v. *Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005); *see also, Thornton*, 587 F.3d at 31.

Ms. Molla if she could sit in an elevated chair while she worked and when Mr. Ayele spoke with and wrote to Mr. Khayat on behalf of Ms. Mekonnen.  Any claims based on those requests, or any other requests made before July 14, 2009, are time-barred.

Neither Ms. Mekonnen's affidavit nor Mr. Ayele's affidavit mentions any requests made on or after July 14, 2009, and Mr. Khayat claimed he was never aware that Ms. Mekonnen had a medical condition for which she needed an accommodation.  In her opposition to summary judgment, Ms. Mekonnen contends she told Ms. Molla repeatedly about her medical condition, and in her statement of material facts, she claims to have asked Ms. Molla and Mr. Khayat for an accommodation at various points in during her employment.  Ms. Mekonnen does not, however, support these contentions with evidence in the record.  It is well-settled that "[f]actual assertions . . . in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment." *Nieves* v. *Univ. of P.R.*, 7 F.3d 270, 276 n. 9 (1st Cir. 1993).  For this reason alone, Ms. Mekonnen fails to present sufficient evidence to support a timely reasonable accommodation claim.

Even if I were to consider the unsupported assertions made in her opposition and statement of material facts as evidentiary, they are insufficient to show that Ms. Mekonnen

made "sufficiently direct and specific" requests to sit while
working after July 14, 2009, as required by both the ADA and
151B.  *Murray* v. *Warren Pumps, LLC*, 821 F.3d 77, 84 (1st Cir.
2016); *see also Ocean Spray Cranberries, Inc.* v. *Mass. Comm'n
Against Discrimination*, 808 N.E.2d 257, 267-68, 270-71 (Mass.
2004).  In *Murray* v. *Warren Pumps, LLC*, the First Circuit found
an employee's testimony "that only broadly suggest[ed] requests
for accommodation," such as statements that the employee "sought
breaks from 'time to time,' without detailing any particular
occasions or explaining whether and how [the employer] actually
denied any such requests," did not establish that she made a
specific request for an accommodation.  821 F.3d at 84.  Ms.
Mekonnen's vague assertions in her opposition and statement of
material facts likewise do not include any information regarding
when she made any additional requests or how OTG responded.
There is no failure of reasonable accommodation claim arising
from OTG's alleged failure to provide her with a seat after July
14, 2009 sufficiently presented by record evidence.  This aspect
of her disability discrimination claim is thus time-barred.

Ms. Mekonnen's reasonable accommodation claim based on her
request to transfer to a utility position faces similar
problems.  She presents no cognizable evidence that she
requested this kind of transfer after July 14, 2009.  In her
opposition to summary judgment, she claims she requested a

transfer "not only in 2008 when I had leg injury but until 2-3 months before I was fired" and that she "repeatedly sought that position . . . because it was better than working by standing due to my leg injury."  Again, Ms. Mekonnen's factual assertions in her memorandum are insufficient to create a triable issue of fact.  *Nieves*, 7 F.3d at 276 n. 9.  Without any admissible evidence of requests after July 14, 2009, I find her request to transfer accommodation claims time-barred.  For the sake of completeness, I will discuss, and reject, the claims on the merits below.

OTG does not dispute that Mekonnen's disability claim based on her termination on November 19, 2009 is timely.  In addition to advancing this specific claim, Ms. Mekonnen attempts to rely on the continuing violations doctrine to save her otherwise untimely claims.  The continuing violations doctrine allows an employee to "obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period."  *Tobin II*, 553 F.3d at 130.  "However, it is now well established that the doctrine does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' but only to discriminatory conduct that takes place 'over a series of days or perhaps years.'"  *Id.* (quoting *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 115 (2002)); *see also Everett* v. *357 Corp.*, 904 N.E.2d 733, 751

24

(Mass. 2009) ("[A] discrete, separate act . . . does not draw
other allegedly discriminatory acts into its scope, either
prospectively or retrospectively.").

The continuing violations doctrine does not apply to the
acts underlying Mekonnen's disability claims.  Denying a request
for a reasonable accommodation, denying a transfer request, and
issuing a written warning are all discrete acts that occur on a
particular day.  *Tobin II*, 553 F.3d at 130; *see also Ayala* v.
*Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015) ("[A] negative
performance evaluation, transfer to another area, and letter of
warning also constitute discrete acts.").

Though any disability discrimination claims based on the
June 10, 2008 written warning for sitting while working and the
May 19, 2009 written warning for failing to check expiration
dates are time-barred, I may consider these acts "'as background
evidence in support of a timely claim'" for wrongful
termination.  *Tobin II*, 553 F.3d at 142 (quoting *Morgan*, 536
U.S. at 113).  However, because any consideration of the claims
Ms. Mekonnen has advanced in conjunction with her wrongful
termination claim – whether for reasonable accommodation or for
disparate treatment – begins with an examination of whether she
is disabled or handicapped, I will address that question first
before proceeding.

3.   Disabled or Handicapped Under the ADA or 151B

The ADA and 151B both use the same three-part test to determine whether an impairment qualifies as a disability or a handicap, with one slight difference.  *Ramos-Echevarria* v. *Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011); *City of New Bedford* v. *Mass. Comm'n Against Discrimination*, 799 N.E.2d 578, 588 n. 27 (Mass. 2003) (holding that "[the SJC] has not previously articulated this three-step analysis for resolution of the first part of the first prong of claims of handicap discrimination . . ." and that "[it] see[s] no reason to deviate from Federal law in this respect." (internal citations omitted)).

First, I consider whether the alleged condition "constitutes a mental or physical 'impairment.'"  *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002).  Second, I "identify the life activities upon which [plaintiff] relies to determine whether they constitute 'major life activities.' . . . that is, activities that are 'of central importance to daily life.'"[8]  *Id.* (internal citations omitted).  Finally, I determine

---

[8] This is where federal and state law diverge slightly.  Mass. Gen. Laws ch. 151B § 1(2) defines the term "major life activity" broadly to include "working."  *City of New Bedford* v. *Mass. Comm'n Against Discrimination*, 799 N.E.2d 578, 589 and n. 28 (Mass. 2003).  In contrast, "[t]he United States Supreme Court has questioned whether 'working' qualifies as a 'major life activity' under Federal law."  *Id.* at 589 n. 29.  The federal statutory scheme has since been expanded both to include

"whether the impairment substantially limits the activity found to be a major life activity."  *Id.*

For many years, "the definitions of 'disability' and 'handicap' [were] virtually identical" under the ADA and 151B. *Whitney* v. *Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 32 n. 1 (1st Cir. 2001).  However, the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, 3553-55 (2008), codified in 42 U.S.C. § 12101 *et seq.* , which became effective on January 1, 2009, "expanded the definition of 'disability'" under the ADA.  *Thornton*, 587 F.3d at 34 n. 3.  In particular, the ADA now "provides that '[t]he term 'substantially limits' shall be interpreted consistently with the finding and purposes of the ADA Amendments Act of 2008." *Murray* v. *Warren Pumps, LLC*, 2013 WL 5202693, at *5 (D. Mass. Sept. 12, 2013), *aff'd*, 821 F.3d 77 (1st Cir. 2016) (modifications in original).  Because 151B "does not have an analogous clause," I have previously held that 151B employs a narrower, pre-ADAAA understanding of the term "substantially limits."  *Id.* at *5-6.

The only timely ADA claims concern conduct that occurred after July 14, 2009.  I will therefore use the ADAAA's more

---

"working" in the definition of a "major life activity" and, in many respects, reach further than the state definition.  *See infra* note 10.

generous standard to evaluate Ms. Mekonnen's federal claims.
Moreover, because it is no longer as clear whether the Supreme
Judicial Court will continue to read 151B in a more narrow
fashion, I will, out of an abundance of caution, apply the
ADAAA's standard to Ms. Mekonnen's state law claim as well.[9]

As discussed above, Ms. Mekonnen has, at times, identified
two different conditions from which she suffers.  First, she
claimed to suffer consequences from the January 2008 leg injury.
Second, she claimed to suffer from osteoarthritis in the same
leg, a condition which was aggravated by the January 2008
accident.  In her opposition to summary judgment and
accompanying affidavit, she disavows reliance on the January

---

[9] The Massachusetts Appeals Court discussed this issue at some
length in *Massasoit Industrial Corp* v. *Mass. Com'n Against
Discrimination*, 73 N.E.3d 333, 340 n. 6 (Mass. App. Ct. 2017).
After tracing the history of the ADAAA, the court expressed its
view that "these broad changes in Federal law would be
considered material to the Supreme Judicial Court's current
interpretation" of 151B and that the court could "look to the
ADAAA . . . for purposes of interpreting similar language in
c. 151B." *Id.* But, because the case before it would be
affirmed "even under the law (State and Federal) as it existed
before the ADAAA," the court chose not to "resolve the question
ourselves." *Id.* At least one MCAD decision has since relied on
*Massasoit* to apply the ADAAA's broader view of disability to
151B's definition of handicap. *Codinha* v. *Bear Hill Nursing
Ctr., Inc.*, No. 15-BEM-00248, 2017 WL 1397556, at *7 (MCAD Mar.
30, 2017); *see also Garrison* v. *Lahey Clinic Med. Ctr.*, No. 07-
BEM-00796, 2017 WL 466109, at *6 (MCAD Jan. 6, 2017) (Decision
of the Full Commission) (discussing the ADAAA and noting the
MCAD has "historically adhered to" a "less restrictive and more
liberal construction of the term disability" when interpreting
151B). The Supreme Judicial Court has apparently not yet
explicitly ruled on this question.

2008 leg injury as her alleged disability and focuses solely on her osteoarthritis condition.   For the sake of completeness, I will address both conditions.

       *a.*   *January 2008 Leg Injury*

Assuming, without deciding, that Ms. Mekonnen has satisfied the first two parts of the test, I find she has failed to show that her January 2008 leg injury itself substantially limited her ability to stand or work.   Ms. Mekonnen stated at her deposition that she returned to work two weeks after the accident and continued working full time.   She sought medical attention for her injury twice in the immediate aftermath of her accident.   Both times, she was advised not to work for a few days, but was given no other restrictions.   The medical record from her January 22, 2008 visit explains that her contusion and sprain should heal in a few weeks and that she should treat her pain with ice and ibuprofen.   It made no mention of the need for any long-term adjustments to her work schedule or working conditions.

According to her affidavit, Ms. Mekonnen views the January 2008 leg injury not as a disability from which she continues to suffer but as a byproduct of her osteoarthritis.   She stated that "the fallen object on my knee was **not** the case [*sic*] of my permanent disability resulting from a bone disease aka medically known as 'osteoarthritis'" and that "the injury was permanent

from the bone disease and **not** because of a wooden door that was fallen on my leg while working for OTG." (emphasis in original).

The January 2008 leg injury did not, in and of itself, substantially limit her ability to stand or work.  The medical records suggest the injury was, at most, a relatively minor and temporary condition from which Ms. Mekonnen would recover in a few weeks.  Indeed, this characterization of the injury is, in part, confirmed by her return to full-time work two weeks later. Even under a liberal definition, her January 2008 injury would not qualify as a disability or handicap under either the ADAAA or state law because there is no evidence that the injury substantially limited her ability to stand or work for any period of time longer than a couple weeks.  *Murray*, 2013 WL 5202693, at *5-6.

Indeed, Ms. Mekonnen herself no longer claims the injury alone limited her ability to stand or work.  Rather, according to her affidavit, the injury aggravated her preexisting leg problem, which in turn prevented her from standing after she returned to work.  Her disability or handicap can be understood only as the broader condition of a leg problem due to osteoarthritis, exacerbated by but largely independent of the January 2008 accident.

> b.  *Osteoarthritis*

Ms. Mekonnen's leg problem due to osteoarthritis may

qualify as a disability or handicap under the ADA and 151B.  Ms. Mekonnen stated in her affidavit that she suffered from osteoarthritis and that her condition made it difficult for her to stand, especially after the January 2008 accident.  Although I have struck the submission, I note an Ethiopian medical certificate referenced by Ms. Mekonnen declared that, as of 2007, she was suffering from osteoarthritis of the right knee joint.  Her osteoarthritis constitutes a physical impairment, *Cf. Benoit* v. *Tech. Mfg. Corp.*, 331 F.3d 166, 172, 176 (1st Cir. 2003) (employee's "low back strain and strain of the knees with possible early osteoarthritis" constituted physical impairment), and the ADA now provides that both standing and working qualify as major life activities.  42 U.S.C. § 12102(2)(A).

But, Ms. Mekonnen has failed to present sufficient evidence to show that her leg problem substantially limited her ability to work.  The undisputed evidence shows she was working a full schedule prior to her injury, she was back at work on her usual schedule two weeks after the January 2008 accident, and worked full-time until she was terminated more than a year later.  The doctor's notes she received after her accident advised her to remain out of work for only a few days.  Her leg problem, of whatever etiology, either as it existed before January 2008 or as it was after the accident, does not appear to have substantially limited her ability to work.

31

Even if I were to consider the Ethiopian medical certificate, which declared Ms. Mekonnen "unfit for any work" as of 2007, it would not provide sufficient evidence for Ms. Mekonnen to survive summary judgment on this theory, especially because the record is clear that Ms. Mekonnen was able to, and did in fact, work after receiving this diagnosis. *See Williams* v. *Kennedy*, 38 F. Supp. 3d 186, 194 (D. Mass. 2014) ("Although the ADAAA counsels a court to broaden its view of what constitutes a disability, no authority suggests that the ADAAA was intended to supplant the requirements of FED. R. CIV. P. 56."); *see also Weaving* v. *City of Hillsboro*, 763 F.3d 1106, 1112 (9th Cir. 2014) (finding that, under ADAAA standard, "[t]he record does not contain substantial evidence showing that [plaintiff] was limited in his ability to work compared to 'most people in the general population'" (quoting 29 C.F.R. § 1630.2(j)(1)(ii))).

The evidence of substantial limitations on her ability to stand is also thin.  In her affidavit, Ms. Mekonnen stated that she "was unable to stand for extended hours and [was] compelled to sit when the job was slow and no customer was not [*sic*] around."  Such a declaration certainly would not have been sufficient to show a disability under the narrower, pre-ADAAA standard for disability or handicap that Massachusetts still appears to employ.  *See Ramos-Echevarria*, 659 F.3d at 188-90.

That declaration is also likely insufficient under the more permissive ADAAA standard. *Williams*, 38 F. Supp. 3d at 194-95. However, because Ms. Mekonnen's condition "does not *clearly* fall outside the range of disability under the ADAAA" and because "'the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis,'" *Murray*, 2013 WL 5202693, at *8 (quoting C.F.R. § 1630.2(j)(1)(iii)), I will not grant summary judgment on this ground.

        *c.   Regarded As*

Finally, Ms. Mekonnen has, at times, appeared to allege that OTG regarded her as being disabled and discriminated against her based on this perception.  Before the ADAAA, a plaintiff bringing a "regarded as" disabled claim had to show either "'(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.'"  *Ruiz-Rivera*, 521 F.3d at 83 (quoting *Sullivan* v. *Neiman Marcus Grp., Inc.*, 358 F.3d 110, 117 (1st Cir. 2004)).  "After the enactment of the ADAAA, however, a plaintiff bringing a 'regarded as' claim under the ADA needs to plead and prove only that she was regarded as

having a physical or mental impairment." *Mercado* v. *Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016).

Ms. Mekonnen cannot bring a failure to accommodate claim under the theory that she was "regarded as disabled," 42 U.S.C. § 12201(h) (referencing 42 U.S.C. § 12102(1)(C)), so I do not examine her transfer request claims under a "regarded as" disabled theory. Beyond a section heading referring to "[p]laintiff's perceived disability and/or impairment," Ms. Mekonnen does not discuss her "regarded as" claim in her opposition to summary judgment. For the sake of completeness, however, I will consider Ms. Mekonnen's termination claim under a regarded as disabled theory as well.

* * *

OTG does not dispute that Ms. Mekonnen was able to perform the essential functions of her job with or without a reasonable accommodation. I will proceed to evaluate the remaining issues pertaining to her reasonable accommodation and disparate treatment claims separately.

#### 4. Reasonable Accommodation

Ms. Ms. Mekonnen has failed to establish that transferring her to a utility position would be a reasonable accommodation. It is well-settled that "a plaintiff must show, even at the summary-judgment stage, that the requested accommodation is facially reasonable." *Echevarria* v. *AstraZeneca Pharm. LP*, 856

34

F.3d 119, 128 (1st Cir. 2017).  To meet this burden, "a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances."  *Reed* v. *LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001).

Ms. Mekonnen does not demonstrate how a transfer to a utility position would have been an accommodation for her particular disability or handicap.  The contrary appears to be the case.  Employees in utility positions have to carry products from the storage room to the storefront, stock shelves, and clean the store.  According to Mr. Khayat, utility positions "are significantly more physically[ ] demanding than the Cashier positions at OTG."  Employees in utility positions "spend a majority of their shifts on their feet walking, carrying and/or delivering products to various OTG locations throughout the airport."  Ms. Mekonnen does not dispute this description of a utility worker's duties.  Indeed, she submitted affidavits from two former utility workers, who both characterize their duties in a similar manner.

There is, in short, no evidence demonstrating that a transfer to this position would have relieved Ms. Mekonnen from standing.  In order to perform the essential functions of a utility worker, she would have had to be on her feet carrying

products out to the storefront and inspecting products throughout the store.  In her own affidavit, Ms. Mekonnen described how she was asked once to climb a stool to inspect the expiration dates in the dairy fridge, but she "was unable to do so" because she "can **not** stand on floor for extended time let alone on stool that require balancing oneself and keep from falling."  (emphasis in original).  Even if she were relieved from having to inspect higher shelves, Ms. Mekonnen would still have to stand on the floor for extended periods of time to perform the tasks of a utility worker.

Because a transfer to a utility position would not enable her to perform the essential functions of her job, I find that it would not have been a reasonable accommodation.  *Reed*, 244 F.3d at 259; *see also Bryant* v. *Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 170 (D. Mass. 2004) (employee's proposed accommodation of working in a position that included lifting and moving patients as essential functions was not reasonable because employee's disability limited her ability to lift). Having failed to identify a reasonable alternative accommodation,[10] Ms. Mekonnen's accommodation claim fails.

---

[10] I note, without deciding, that Ms. Mekonnen's request to sit on an elevated chair may constitute a reasonable accommodation in such circumstances.  However, as noted above, any reasonable accommodation claim based on this kind of request is time-barred.

5.   Disparate Treatment

Assuming for present purposes that Ms. Mekonnen can establish the first two parts of her *prima facie* case of disability discrimination as to her termination, I turn to the final part: whether she has shown that OTG terminated her "because of, in whole or in part," her disability or handicap. *Tobin I*, 433 F.3d at 104.  Again, though inadequately supported, at this stage, I will assume that Ms. Mekonnen has met that burden.  One of the written warnings Ms. Mekonnen received, and the only warning that bears Ms. Mekonnen's signature, was for sitting while working.  If she had to sit because of her disability, Ms. Mekonnen would, in effect, have been disciplined for seeking out her own accommodation for her disability after her earlier requests had been denied.  If she was terminated in part because of the warning, then arguably she would have been terminated in part because she was disabled.

My inquiry does not end there.  Instead, the burden shifts to OTG, which has articulated a legitimate, nondiscriminatory reason for terminating Ms. Mekonnen: Ms. Mekonnen was terminated because of her consistently poor job performance.  Ms. Mekonnen received three failing secret shopper reports, which included allegations of poor customer service.  OTG warned Ms. Mekonnen that if her performance did not improve, she would be terminated.  Poor work performance, of course, qualifies as a

legitimate, nondiscriminatory reason for termination.  *See Izzo v. Genesco, Inc.*, 171 F. Supp. 3d 1, 8 (D. Mass. 2016).

At the final step of this inquiry, I conclude Ms. Mekonnen has not met her burden to show that OTG's reason is pretextual. She attempts to show pretext by arguing she was, in fact, performing her job well.  She points to one early positive secret shopper report and to the additional training she did after work to improve her customer service skills.  She also attempts to introduce evidence, including the cell phone records which I have already stricken, to dispute the accuracy of the other secret shopper reports.

Ms. Mekonnen cannot meet her burden of showing pretext "simply by questioning [OTG's] articulated reason" or by demonstrating that OTG was wrong to believe she was not performing her job well.  *Gadson* v. *Concord Hosp.*, 966 F.2d 32, 35 (1st Cir. 1992); *see also Lawton* v. *State Mut. Life Assurance Co. of Am.*, 924 F. Supp. 331, 345 (D. Mass. 1996) ("Evidence of mistaken good-faith belief . . . fails to suffice as evidence of pretext."); *Sullivan* v. *Liberty Mut. Ins. Co.*, 825 N.E.2d 522, 541-42 (Mass. 2005) ("[O]ur task is not to evaluate the soundness of [the employer's] decision making, but to ensure it does not mask discriminatory animus.").  As then-Judge Gorsuch wrote for the Tenth Circuit:

> That individuals and companies sometimes make employment
> decisions that prove to be bad ones in hindsight usually
> suggests no more than that—that they got it wrong.  To
> support an inference of pretext, to suggest that something
> more nefarious might be at play, a plaintiff must produce
> evidence that the employer did more than get it wrong.  He
> or she must come forward with evidence that the employer
> didn't really believe its proffered reasons for action and
> thus may have been pursuing a hidden discriminatory agenda.

*Johnson* v. *Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

Even if OTG was mistaken in its evaluation of Ms. Mekonnen's work performance, and even if her belatedly proffered cell phone records indicate that the secret shopper reports or other customer complaints were inaccurate, she has submitted no evidence to show that OTG *believed* they were inaccurate or that OTG's true motivation for terminating her was otherwise discriminatory.

Nor does the warning she received for sitting while working create a genuine issue of material fact regarding pretext.  She received the warning over a year before she was terminated and was subject to negative reviews and discipline several times between the warning and her termination, none of which related to her sitting while working.  The warning alone does not "refute the clear evidence put forward" by OTG "showing that it was poor [job performance], and not disability, that constituted the real reason for [Ms. Mekonnen's] termination." *Tobin I*, 433 F.3d at 105.  Because she has proffered no evidence that her leg

39

problem played a role in OTG's decision to terminate her, Ms. Mekonnen cannot successfully oppose summary judgment for OTG as to her disability discrimination claim under either federal or state law.

**B.   *Religious Discrimination***

Ms. Mekonnen claims OTG's failure to accommodate her request for Sunday mornings off constituted religious discrimination in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 151B.  The First Circuit uses a two-part framework to evaluate religious discrimination claims alleging a failure to accommodate under both state and federal law.  *Cloutier* v. *Costo Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).  "First, the plaintiff must make her *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action."  *Id.*  If the plaintiff makes this showing, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship."  *Id.*

Chapter 151B uses a similar framework to evaluate failure to accommodate claims.  Under 151B, "[t]he employee bears the initial burden of establishing a prima facie case that the employer required the employee to violate a required religious

practice" and "'that he or she gave the employer the required notice of the religious obligations.'" *Brown* v. *F.L. Roberts & Co., Inc.*, 896 N.E.2d 1279, 1283 (Mass. 2008) (quoting *N.Y. & Mass. Motor Serv., Inc*. v. *Mass. Comm'n Against Discrimination*, 517 N.E.2d 1270, 1276 (Mass. 1988)). "If the employee makes this prima facie case, the burden then shifts to the employer 'to prove that accommodation of the [employee's] religious obligations would impose . . . an undue hardship' pursuant to the statute." *Id.* (modifications in original) (quoting *N.Y. & Mass. Motor Serv., Inc.*, 517 N.E.2d at 1276).

## 1.   Timeliness

Ms. Mekonnen's religious discrimination claims based on accommodations she sought in 2007, 2008, or any other date before July 14, 2009 are time-barred. As discussed above, the denial of a request for accommodation "'is a discrete discriminatory act triggering the statutory limitations period.'" *Tobin II*, 553 F.3d at 129 (quoting *Ocean Spray Cranberries, Inc.*, 808 N.E.2d at 268); *see also Elmenayer* v. *ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003) ("[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation . . . [and] is the sort of 'discrete act' that must be subject of a complaint to the EEOC within 300 days."). Even if Ms. Mekonnen did not receive a clear response from OTG regarding her

request, the fact that OTG allegedly continued to schedule her
on Sundays in 2007 and 2008 meant she "'knew or reasonably
should have been aware that the employer was unlikely to afford
[her] a reasonable accommodation.'"   *Tobin II*, 553 F.3d at 133
n. 10 (quoting *Ocean Spray Cranberries, Inc.*, 808 N.E.2d at
268).

I find any religious discrimination claims based on denied
requests for Sundays off before July 14, 2009 to be time-barred.
I will, however, consider these earlier requests as background
evidence when evaluating her claims based on requests made on or
after July 14, 2009.

2.   *Prima Facie* Case Under Title VII and 151B

Ms. Mekonnen cannot establish a *prima facie* case of
religious discrimination under either Title VII or 151B because
she has not shown she was, in fact, required to work Sunday
mornings after July 14, 2009.   OTG has submitted Ms. Mekonnen's
schedule from February 1, 2009 to November 20, 2009 as part of
the summary judgment record and it does not show her scheduled
for any Sunday shifts.   With her opposition to summary judgment,
Ms. Mekonnen submitted a document in which she compares her
biweekly wage from February 2009 to November 2009 to the
schedule OTG submitted and concludes she worked more hours than

42

those listed on her schedule.  According to Ms. Mekonnen, she must have worked these extra hours on Saturdays and Sundays.[11]

For the purpose of evaluating the present motion, I will accept Ms. Mekonnen's assertion that, had she worked the number of hours listed on her schedule, she would be entitled to a biweekly wage of $675.00.  Starting with the pay period that ran from July 6, 2009 to July 19, 2009 until she was terminated in November 2009, Ms. Mekonnen received eleven pay checks.  Of the eleven, nine were for more than $675.00; one, for the pay period running from September 7, 2009 to September 20, 2009, was for $309.06; and one was for $343.35, representing a one week pay period.[12]

Of those nine pay checks for more than $675.00, seven are for less than $693.00, meaning in those seven pay periods, Ms. Mekonnen worked at most an extra two hours,[13] while the check for $343.35 for the one week pay period indicates she worked no more than one extra hour.  Taken together, then, these ten checks do not support Ms. Mekonnen's assertion that she was forced to take

---

[11] OTG has moved to strike the second page of this document.  The second page is Ms. Mekonnen's calculations of her hours worked based on her earnings statements, while the other pages are copies of her earning statements and two calendars for the years 2008 and 2009.  As I indicated when discussing the motion to strike, I will treat her calculations and conclusions as argument and not as substantive evidence in its own right.
[12] For all of these checks, I use the gross amount in order to calculate the hours she worked.
[13] At the time, Ms. Mekonnen was paid $9 per hour.

on multiple extra shifts.  Rather, they show her occasionally working a little beyond her regularly scheduled seven and a half hour days, and add up to no more than two additional hours over each two week period.

The two pay checks that show Ms. Mekonnen working more than two extra hours still do not establish that Ms. Mekonnen worked Sunday mornings after July 14, 2009.  Ms. Mekonnen received a check for $736.47 for the pay period ending on August 2, 2009, which results in $61.47 above the expected amount, and a check for $726.84 for the pay period ending on September 6, 2009, which results in $51.84 above the expected amount.  Neither suggests that Ms. Mekonnen worked a complete extra shift. Instead, Ms. Mekonnen worked approximately an extra seven hours during the August 2, 2009 pay period and an extra six hours during the September 6, 2009 pay period.

Moreover, even if Ms. Mekonnen could show she had worked a full extra shift during these two pay periods, she cannot show that the extra shift was on a Sunday morning.  Ms. Mekonnen herself concluded that these earning statements merely establish that "plaintiff had worked extra hours other than the M-F, 5:00am-1:00pm work shift/schedule on Saturdays and Sundays." Working on Saturday would not have interfered with her church services.  In fact, based on Ms. Mekonnen's affidavit, even working the Sunday afternoon and evening shift would not have

interfered with her church services.  She stated that she requested in her employment application "to have time off on Sundays, (not necessarily the 'whole' Sunday but for sufficient time to worship in the morning and to work in the afternoon)."

Finding no demonstration in the evidence of record Ms. Mekonnen was forced to work Sunday mornings after July 14, 2009, I will grant summary judgment to OTG as to her religious discrimination claims.

## C. *Sex Discrimination*

Ms. Mekonnen contends she was denied a transfer to a utility position and she was terminated because of her gender. As with her claim for disability discrimination, I use the *McDonnell-Douglas* framework to evaluate her gender discrimination claims under Title VII and 151B.  *Douglas* v. *J.C. Penney Co., Inc.*, 474 F.3d 10, 13-14 (1st Cir. 2007) (citing, *inter alia*, *McDonnell Douglas Corp*, 411 U.S. at 802).[14]

### 1.  Denial of Transfer

To the extent Ms. Mekonnen bases her gender discrimination claims on requests for transfer to a utility position made before July 14, 2009, those claims are time-barred.  As

---

[14] Again, the final stage of the *McDonnell-Douglas* framework "appears to be slightly less stringent" under 151B than under federal law, for a plaintiff can "overcome a motion for summary judgment if the plaintiff shows that just one of the proffered reasons was pretextual."  *Douglas* v. *J.C. Penney Co., Inc.*, 474 F.3d 10,  14 n. 2 (1st Cir. 2007).

discussed previously, a denial of transfer request is a discrete act to which the continuing violations doctrine does not apply. *Morgan*, 536 U.S. at 114.

Ms. Mekonnen presents no admissible evidence that she requested a transfer to a utility position and was denied such a transfer, whether because of her gender or for any other reason, after July 14, 2009.  In her opposition to summary judgment, she claims for the first time that she requested a transfer two or three months before she was fired and that her request was denied because her supervisor told her the job was for men only. She cites no record evidence to support this assertion.  Her complaint in this court refers only to a request for transfer made "soon after" Ms. Mekonnen received the June 10, 2008 written warning for sitting on a plastic box while working.

Because Ms. Mekonnen fails to support her gender discrimination claim with admissible evidence that she was denied a transfer after July 14, 2009, *see Nieves*, 7 F.3d at 276 n. 9, I will grant summary judgment on the grounds that all of her request for transfer claims are time-barred.

Considering Ms. Mekonnen's request for transfer claims on the merits, I am separately obligated to grant summary judgment for OTG.  In order to establish a *prima facie* case of gender discrimination, Ms. Mekonnen must show that OTG took an adverse employment action against her.  To be sure, the denial of a

request for transfer can constitute an adverse employment action
under some circumstances. *Gorski* v. *N.H. Dep't of Corrections*,
290 F.3d 466, 475 (1st Cir. 2002) ("[I]n an appropriate case the
denial of a request for a transfer may be sufficiently harmful
to amount to an adverse employment action."(citing *Randlett* v.
*Shalala*, 118 F.3d 857, 862 (1st Cir. 1997))).  Even so, a
plaintiff must present some evidence explaining how she was
harmed by the denial of a transfer. *Gorski*, 290 F.3d at 475;
*see also Marrero* v. *Goya of P.R., Inc.*, 304 F.3d 7, 24 (1st Cir.
2002) ("[A] minor increase in work responsibilities is not
enough to render a lateral transfer materially adverse.").

Here, Ms. Mekonnnen provides no evidence explaining how the
denial of her request for a transfer to a utility position was
an adverse employment action.  She does not, for example,
demonstrate there was a difference in compensation, hours, or
benefits between the two positions.  Although she contends she
wanted the transfer as an accommodation for her leg injury, as I
have discussed previously, she does not explain how a utility
position would have improved her working conditions.  If
anything, it appears from the record that Ms. Mekonnen would
have been unable, as a result of her injury, to perform the
basic responsibilities of that position.  Ms. Mekonnen's
transfer request claim thus cannot proceed on this record.

2.   Termination

Even assuming that Ms. Mekonnen has made a *prima facie* case of gender discrimination for her termination claims.  Moving to the second step, OTG has provided a legitimate, nondiscriminatory reason for terminating her.  As discussed above in conjunction with her disability discrimination claims, OTG has submitted sufficient evidence to show it believed Ms. Mekonnen was not performing her job well and was not following OTG policies regarding cell phone use during work.

Ms. Mekonnen fails to show OTG's reason for terminating her was pretextual.  Again, Ms. Mekonnen's attempts to undermine the veracity of the secret shopper reports or reports of her cell phone use are insufficient under these circumstances to prove OTG acted with discriminatory animus.  *See Gadson*, 966 F.2d at 35; *Sullivan*, 825 N.E.2d at 541-42.

Ms. Mekonnen also attempts to show pretext by pointing to similarly-situated male employees, who she contends were treated differently.  In order to make a meaningful comparison, Ms. Mekonnen must identify male employees who "closely resemble" her "in respect to relevant facts and circumstances."  *Conward* v. *Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999).  She has failed to do so.

Ms. Mekonnen suggests two comparators: Mulugeta Gifaw and Joseph Temesgen.  Mr. Gifaw was a cashier who worked for OTG in

Logan Airport from November 2006 to March 2008.  He received several warnings for violating company policies, including a reprimand for sitting while working, and was suspended by OTG. After receiving a final warning, Mr. Gifaw threw his employee badge at Mr. Khayat and told him he quit.  Mr. Khayat accepted Mr. Gifaw's resignation but noted on his separation notice that Mr. Gifaw was also terminated.

It is unclear how Ms. Mekonnen was treated differently than Mr. Gifaw.  Both were subject to multiple warnings because their work was below OTG's standards, both were subject to escalating measures of discipline, and both were eventually terminated. The mere fact that Mr. Gifaw asserted greater agency over the timing and manner of his termination is not sufficient to raise the inference that Ms. Mekonnen was treated worse than he.

Even if Ms. Mekonnen could show that Mr. Gifaw was given a longer leash before being terminated, there is a key difference between Mr. Gifaw's and Ms. Mekonnen's circumstances: only Ms. Mekonnen received three secret shopper reports with scores below 70%.  OTG contends that its regular practice was to terminate employees who received three secret shopper reports with scores below 70% and  Ms. Mekonnen has submitted no evidence to dispute this.  I find the three failing secret shopper report scores justifies any purported difference in treatment between Ms. Mekonnen and Mr. Gifaw.  *Perkins* v. *Brigham & Women's Hosp.*, 78

F.3d 747, 751 (1st Cir. 1996) (finding comparator not
sufficiently similar because plaintiff had a "history of
repeated disciplinary actions" while comparator did not).

Mr. Temesgen is no more helpful to Ms. Mekonnen's case.
Mr. Temesgen was also a cashier who worked with Ms. Mekonnen at
OTG.  Mr. Temesgen did not receive three secret shopper reports
with scores below 70%.  In fact, of the six secret shopper
reports for Mr. Temesgen that Ms. Mekonnen submitted, all but
one were above 70%.  Moreover, Mr. Temesgen was never subject to
any warnings or other disciplinary actions while working at OTG.

Assuming Ms. Mekonnen could show she was disciplined
differently than Mr. Temesgen for using a cell phone at work,
their employment histories, and not their genders, adequately
explains the difference in treatment.[15]  After she received a
written warning in May 2009 for failing to check an expiration
date on a product, Ms. Mekonnen was told that further
infractions would result in her termination.  In contrast, Mr.
Temesgen had never received a written warning.  If he were found
to be on his cell phone during work, he would presumably have

---

[15] In her opposition to summary judgment, Ms. Mekonnen contends
she was treated differently than Mr. Temesgen because both of
them spoke on their cell phones during work, but only she was
terminated.  She again does not support this assertion with
admissible evidence.  In response, OTG submitted an affidavit
from Mr. Khayat, in which he claims he never knew that Mr.
Temesgen spoke on his cell phone during his work shift.

been subject to the same escalating series of warnings Ms.
Mekonnen had already received by the time she was terminated in
November 2009.  Under these circumstances, I cannot find Mr.
Temesgen to be a similarly situated employee.

Ms. Mekonnen can point to no evidence to suggest that OTG's
proffered reason for her termination – that she performed poorly
at her job – was pretextual.  Even if OTG did not permit her to
take timely breaks and did not give her the proper money to make
change during her shift — all facts that OTG disputes — Ms.
Mekonnen points to no evidence showing that OTG took any these
actions because of her gender.  These allegations are
insufficient to undercut OTG's legitimate, nondiscriminatory
reason for terminating Ms. Mekonnen.

## D.  *Retaliation*

Without citing a particular statute, Ms. Mekonnen claims
OTG retaliated against her for filing an internal written
complaint in 2007 and for making subsequent oral complaints to
OTG's management.  I will assume Ms. Mekonnen seeks to recover
under the anti-retaliation provisions of the ADA, Title VII, and
151B.

As with her other claims, to the extent Ms. Mekonnen claims
OTG retaliated against her before July 14, 2009, her claims are
time-barred.  *Velazquez-Perez* v. *Developers Diversified Realty
Corp.*, 753 F.3d 265, 276 (1st Cir. 2014) (referencing the

timeliness requirements for retaliation claims under Title VII); *Crevier* v. *Town of Spencer*, 600 F. Supp. 2d 242, 258 (D. Mass. 2008) ("[T]he plaintiff's action alleging unlawful retaliation in violation of the ADA or chapter 151B must be brought within three years of the alleged retaliatory event."). I will consider retaliatory acts alleged to have occurred after July 14, 2009, namely her termination, the withholding of her vacation pay, and the other assorted conduct mentioned by Ms. Mekonnen in her opposition to summary judgment.

To establish a *prima facie* case of retaliation under the ADA, Title VII, and 151B, Ms. Mekonnen must show "(1) that she engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action." *Crevier*, 600 F. Supp. 2d at 259-60. If Ms. Mekonnen were to make this showing, the burden shifts to OTG "to articulate a legitimate, nonretaliatory reason for its employment decision." *Wright* v. *CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (internal quotations and citations omitted). Once OTG articulates a reason, Ms. Mekonnen must show the proffered reason is mere pretext. *Id.*

Assuming Ms. Mekonnen could make a *prima facie* showing of retaliation, she again fails to show that OTG's proffered reason for terminating her was mere pretext, for the same reasons I

have discussed previously.  Based on the secret shopper reports, as well as OTG's own observations of her performance, OTG determined that Ms. Mekonnen did not meet its standards for customer service.  In response, Ms. Mekonnen mostly rehashes the mistreatment she claims she experienced while working at OTG, without pointing to evidence that would show OTG's true reason for termination was retaliation.  *Sekamate* v. *Newton Wellesley Hosp.*, 2002 WL 31194873, at *12 (D. Mass. Sept. 3, 2002) (granting summary judgment for employer on retaliation claim under ADA, Title VII, and 151B because "[p]laintiff relies purely on speculation to connect his complaints about discrimination to the disciplinary action and his ultimate termination").

I also find Ms. Mekonnen has failed to show OTG's proffered reason for withholding her vacation pay was pretextual.  It was OTG's written policy not to pay terminated workers their accrued vacation benefits.  OTG's employee manual states that "[t]erminated employees forfeit their accrued vacation days." As I will discuss in the following section, this policy may run afoul of the Massachusetts Wage Act, *see generally*, *Elec. Data. Sys. Corp.* v. *Attorney Gen.*, 907 N.E.2d 635 (Mass. 2009), but otherwise appears facially neutral.  Moreover, Ms. Mekonnen has failed to show that OTG applied the policy in a selective and retaliatory manner.  Without evidence indicating that OTG acted

with retaliatory intent, OTG's policy — while undoubtedly problematic under state law — provides a nonretaliatory reason for withholding Ms. Mekonnen's vacation pay. *See, e.g.*, *Gembus* v. *MetroHealth Sys.*, 2007 WL 642075, at \*7 (N.D. Ohio Feb. 27, 2007), *aff'd*, 290 F. App'x 842 (6th Cir. 2008) ("[I]t is not enough for Gembus to opine that MetroHealth's policy was illegal under the FLSA, as she must present evidence that she was terminated for discriminatory or retaliatory reasons and not because she violated another policy that allegedly offends a wholly different statute."); *see also Hazen Paper Co.* v. *Biggins*, 507 U.S. 604, 612 (1993) ("[I]t cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA.  The employee's race is an improper reason, but it is improper under Title VII, not the ADEA.").

Finally, the assorted acts mentioned by Ms. Mekonnen in her opposition are not acts of retaliation, but are plainly the "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006).  Her issues with her lunch break and coverage at the cash register, as well the other "reprehensible instances" she references are typical workplace complaints that Ms. Mekonnen has failed to link to retaliatory animus on the part of OTG.

### E.    Violation of Massachusetts Wage Act

Finally, though her discrimination claims fail, Ms. Mekonnen is entitled to at least some recovery for her state wage law claim.  Under the Massachusetts Wage Act ("Wage Act"), MASS. GEN. LAWS ch. 149 § 148 *et seq.*, MASS. GEN. LAWS ch. 151 § 1 *et seq.*, "an employee whose employment is terminated involuntarily must be paid in full on the day of discharge."  *Prozinksi* v. *Northeast Real Estate Servs., LLC*, 797 N.E.2d 415, 419 (Mass. App. Ct. 2003).  The Wage Act defines wages to include "any holiday or vacation payments due an employee under an oral or written agreement."  MASS. GEN. LAWS ch. 149 § 148.  An employee may bring a civil action to enforce § 148, "provided the employee first files a complaint with the attorney general and either 90 days elapses or the attorney general assents to the earlier filing of a private action by the employee."  *Clermont* v. *Monster Worldwide, Inc.*, 102 F. Supp. 3d 353, 357-58 (D. Mass. 2015) (citing MASS. GEN. LAWS ch. 149 § 150).  It is undisputed that OTG, following its policy on vacation pay for terminated workers, did not pay Ms. Mekonnen for her vacation time on the day she was discharged and did not pay her the $335.70 she was owed until February 12, 2010.

The question remaining concerns the damages to which Ms. Mekonnen is entitled.  The Wage Act provides that a prevailing employee "shall be awarded treble damages, as liquidated

damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees." MASS. GEN. LAWS ch. 149 § 150.  However, if an employer pays the employee after the day of discharge but before the employee files a complaint, the employer "'is not required to pay treble the lost wages and benefits'" and must pay only "'the interest foregone from the delay in payment, which would be trebled under the Act.'"  *Clermont*, 102 F. Supp. 3d at 358 (quoting *Dobin* v. *CIOview Corp.*, 2003 WL 22454602, at *7 (Mass. Super. Oct. 29, 2003)); *Guevara-Saldago* v. *Hayes-Meninno, LLC*, 125 F. Supp. 3d 379, 388 (D. Mass. 2015).

Ms. Mekonnen did not file her complaint with the Attorney General until May 10, 2010, approximately three months after OTG paid her the full amount she was owed.[16]  Thus, I conclude she is entitled as damages to only the foregone interest at the trebled rate caused by the delay in payment, and not to treble her underlying lost wages and benefits.  *Dobin*, 2003 WL 22454602, at *8.  I also conclude she is entitled to her reasonable costs in this litigation.

Because Ms. Mekonnen is a non-attorney pro se litigant, she

---

[16] Although Ms. Mekonnen appears to dispute in her opposition to summary judgment precisely when she received payment from OTG for her vacation benefits, in her complaint to the Attorney General, she herself stated that "I received my vacation pay check on February 12, 2010."

cannot recover attorney's fees. *O'Leary* v. *Nepomuceno*, 693 N.E.2d 701, 703 (Mass. App. Ct. 1998); *see also Kay* v. *Ehrler*, 499 U.S. 432, 434 (1991) ("[A] *pro se* litigant who is *not* a lawyer is *not* entitled to attorney's fees." (emphasis in original)); *Sykes* v. *Dish Network*, 2005 Mass. App. Div. 58, 60 n. 5 ("Generally, a party proceeding without legal counsel is not entitled to recover legal fees.").

Ms. Mekonnen has not herself moved for summary judgment. However, because a careful review of the record establishes there is no genuine dispute of material facts on the issue of Wage Act liability and limited damages, I will nevertheless grant summary judgment for Ms. Mekonnen on her Wage Act claim — since OTG has had adequate opportunity to address the relevant considerations — see Fed. R. Civ. P. 56(f); *see also National Expositions, Inc.* v. *Crowley Maritime Corp.*, 824 F.2d 131, 133-34 (1st Cir. 1987) (noting that the district court has the power to grant summary judgment, even in the absence of a motion, so long as the party adversely affected has had an adequate opportunity to show that its "opponent is not entitled to judgment as a matter of law." (internal quotations and citations omitted) (emphasis in original)).

Ms. Mekonnen shall have judgment of $56.54, as interest trebled, together with prejudgment interest thereon on the

delayed vacation pay.[17]  She also shall have only the costs she actually expended in this litigation.[18]

## IV. CONCLUSION

For the reasons discussed above:

I GRANT in part OTG's motion [Dkt. No. 183] to strike as specified in Section II of this Memorandum and Order;

I GRANT OTG's motion [Dkt. No. 164] for summary judgment as to all of Ms. Mekonnen's discrimination claims, but DENY the motion as to Ms. Mekonnen's Massachusetts Wage Act claim; and,

I GRANT summary judgment for Ms. Mekonnen as to so much of her Wage Act claim regarding vacation pay as constitutes prejudgment interest on delayed payment in the amount of $56.54 together with her only compensable litigation expenses, the

---

[17] Ms. Mekonnen was terminated on November 19, 2009 and was paid $335.70 for her lost vacation benefits on February 12, 2010, a delay of 79 days.  Consequently, at the state interest rate of 12%, interest on the $335.70 is $8.72 ($335.70 times .12 (the state interest rate) times .22 (79/365)).  Because Ms. Mekonnen is entitled to treble damages, this generates a base liquidated damages figure of $26.16.

Ms. Mekonnen is also entitled to pre-judgment interest on the $26.16 in damages from November 19, 2009 to July 25, 2019 at the 12% state interest rate.  She is therefore entitled to $30.38 (26.16 times .12 (the state interest rate) times 9.68 (representing 9 years and 250 days)) in pre-judgment interest.

[18] Ms. Mekonnen's court costs total $280.00, representing the $240 filing fee, $20 security fee, and $15 surcharge she paid when initiating this matter in Suffolk County Superior Court, and the $5 fee for issuing summons.  Because the case was removed to federal court by OTG, OTG bore the separate cost of filing in this court.

costs of $280.00 incurred in filing this action initially in the state court.


*/s/ Douglas P. Woodlock_____*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

## APPENDIX

Two years after this litigation began, Ms. Mekonnen, proceeding *pro se*, filed a similar suit against another employer, Ampco System Parking Co., alleging discrimination on the basis of religion, national origin, and sex, and retaliatory termination. *See generally*, *Mekonnen* v. *ABM Parking Services, Inc.*, Case No. 1:14-cv-12389-IT, 2014 WL 5112110 (D. Mass. Oct. 10, 2014). Judge Talwani dismissed the case for failure to state a claim under FED. R. CIV. P. 12(b)(6) without prejudice and allowed Ms. Mekonnen to file amended pleadings. *Id*. Judge Talwani subsequently dismissed the amended complaint, finding that Ms. Mekonnen had not alleged sufficient facts to survive a motion to dismiss. *Mekonnen* v. *ABM Parking Services, Inc.*, Case No. 1:14-cv-12389-IT at Dkt. No. 53 (D. Mass. July 16, 2015). The First Circuit summarily affirmed this decision. *Mekonnen* v. *ABM Parking Services, Inc.*, Case No. 15-2054 (1st Cir. Jan. 3, 2018).

Over the past two decades, Ms. Mekonnen's former husband, Begashaw Ayele, who has plainly directed the tactics of the instant litigation, *see supra* note 1, has pursued multiple separate pieces of litigation on his own behalf that provide a template for his former wife's employment discrimination claims. *See generally, Ayele* v. *Standard Parking Co., et. al.*, Case No. 1:96-cv-10267-NG (D. Mass. Oct. 2, 1996), *denying interlocutory*

*appeal*, Case No. 96-2230 (1st Cir. Jan 21, 1997) (dismissing three of the four counts of employment discrimination brought by Mr. Ayele.  The parties eventually settled the remaining count and stipulated to the dismissal of the case on June 25, 1998); *Ayele* v. *Allright Boston Parking, Inc.*, Case No. 1:96-cv-12201-REK (D. Mass. Dec. 4, 1998), *aff'd*, 201 F.3d 426 (1st Cir. 1999) (per curiam), *cert. denied* 529 U.S. 1026 (2000) (Mr. Ayele brought suit alleging employment discrimination and Judge Keeton granted summary judgment in favor of the employer); *Ayele* v. *Barton Protective Services, Inc.*, Case No. 1:03-cv-11249-NG (D. Mass. March 3, 2004) (Mr. Ayele asserted claims of employment discrimination on the basis of, among other things, race.  The parties ultimately settled); *Ayele* v. *Allied Security Co.*, Case No. 1:04-cv-12216 (D. Mass. July 26, 2005) (Mr. Ayele filed suit for employment discrimination and wrongful termination.  The parties ultimately settled); *Ayele* v. *U.S. Security Associates, Inc.*, Case No. 1:05-cv-11273-WGY (D. Mass. Oct. 5, 2005), *summarily aff'd*, Case No. 05-2698 (1st Cir. April 5, 2006) (Mr. Ayele alleged that his employer discriminated against him on the basis of, among other things, race.  Judge Young granted summary judgment for the employer); *Ayele* v. *Cognisa Sec. Co., Inc.*, Case No. 1:04-cv-12217, 2005 WL 6431857 (D. Mass. Nov. 18, 2005), *summarily aff'd*, Case No. 01-2874 (1st Cir. May 8, 2006) (Judge Saris, adopting report and recommendations of Magistrate

Judge Bowler granted summary judgment for the employer with respect to Mr. Ayele's claims for discrimination on the basis of race, disability, and national origin); *Ayele* v. *Boston University, et. al.*, Case No. 1:01-cv-12175-MLW (D. Mass. Dec. 1, 2006), *summarily aff'd*, Case No. 07-1358 (1st Cir. Nov. 28, 2007) (dismissing after a bench trial Mr. Ayele's claims for race discrimination and under ERISA); *Ayele* v. *Delta Airlines, Inc.*, 2018 WL 6001021 (D. Mass. Nov. 15, 2018) (dismissing Mr. Ayele's claims under MASS. GEN. LAWS ch. 151B and Title II of the Civil Rights Act for failing to state a claim).

Nor is Mr. Ayele's extensive litigation experience limited to this court. *See, e.g.*, *Ayele* v. *Simkins Industries, Inc.*, 166 F.3d 1199 (2d Cir. Dec. 8, 1998) (per curiam), *cert. denied*, 528 U.S. 904 (1999), *petition for rehearing denied*, 528 U.S. 1107 (2000) (affirming the judgment of the District of Connecticut in favor of the employer following a bench trial on Plaintiff's claims of employment discrimination).

Moreover, Mr. Ayele's experience in this court is not limited to employment discrimination suits; he has also pursued other related categories of claim. *See generally*, *Ayele* v. *G2 Secure Staff, LLC*, Case No. 1:17-cv-10417-RGS (D. Mass. May 5, 2017) (Mr. Ayele sought to vacate or modify an arbitration award entered in favor of his former employer pursuant to the employment agreement and the National Labor Relations Act

("NLRA").   Judge Stearns dismissed the suit, holding that there was no basis for a federal court to disturb the arbitration agreement); *Ayele* v. *Educational Credit Management Corp., Inc.*, Case No. 1:12-cv-11005-NMG, 490 B.R. 460 (D. Mass. March 8, 2013), *summarily aff'd*, Case No. 13-1350 (1st Cir. Oct. 22, 2013), *cert. denied*, 573 U.S. 910 (2014), *petition for rehearing denied*, 135 S. Ct. 343 (2014) (Mr. Ayele unsuccessfully appealed the decision of the Bankruptcy court declining to discharge his student debt as part of his Chapter 7 Bankruptcy petition, *see in re* Ayele, 468 B.R. 24 (D. Mass. Bkr. 2012)).